# UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

MICHAEL PICARD,

       Plaintiff,

– against –

DARCEL D. CLARK, in her official capacity
as District Attorney for Bronx County,
MICHAEL MAGLIANO, in his official
capacity as Chief of Public Safety for the New
York Unified Court System,

       Defendants.

No. 19 Civ. 3059 (DLC)

**PLAINTIFF'S PRE-TRIAL
MEMORANDUM OF LAW**

Brian Hauss
American Civil Liberties Union Foundation
125 Broad Street, 18th Floor
New York, New York 10004
(212) 549-2500
bhauss@aclu.org

*Counsel for Plaintiff*

**TABLE OF CONTENTS**

INTRODUCTION ................................................................................................................. 1

FACTUAL AND PROCEDURAL BACKGROUND ..................................................................... 2

ARGUMENT ...................................................................................................................... 6

   I.   Mr. Picard has standing to challenge the Act. ................................................... 6

   II.  The Act is facially unconstitutional because it imposes a content-based restriction on speech in a traditional public forum. ........................................................................ 8

  III. The Act is substantially overbroad. .................................................................... 16

  IV. The Act violates the First Amendment as applied to Mr. Picard. ...................................... 17

   V.  The Act cannot be saved by a narrowing construction. ..................................................... 18

  VI. A permanent injunction is warranted. ............................................................... 20

CONCLUSION .................................................................................................................. 21

# TABLE OF AUTHORITIES

**Cases**

*Amoco Prod. Co. v. Vill. of Gambell*,
  480 U.S. 531 (1987) ........................................................................ 21

*Burson v. Freeman*,
  504 U.S. 191 (1992) .................................................................. 14, 15

*Califano v. Yamaski*,
  442 U.S. 682 (1979) ........................................................................ 21

*Cayuga Nation v. Tanner*,
  824 F.3d 321 (2d Cir. 2016) ............................................................ 7

*City of Boerne v. Flores*,
  521 U.S. 507 (1997) ........................................................................ 10

*Cox v. Louisiana* (*Cox II*),
  379 U.S. 559 (1965) ............................................................ 12, 13, 16

*Craig v. Harney*,
  331 U.S. 367 (1947) .......................................................................... 8

*Cutting v. City of Portland*,
  802 F.3d 79 (1st Cir. 2015) ............................................................ 17

*Elrod v. Burns*,
  427 U.S. 347 (1976) ........................................................................ 21

*Farrell v. Burke*,
  449 F.3d 470 (2d Cir. 2006) ............................................................ 7

*Gentile v. State Bar of Nev.*,
  501 U.S. 1030 (1991) ........................................................................ 8

*Hotel Emps. & Rest. Emps. Union v. City of N.Y. Dep't of Parks & Recreation*,
  311 F.3d 534 (2d Cir. 2002) .......................................................... 10

*Huminski v. Corsones*,
  396 F.3d 53 (2d Cir. 2005) ................................................. 9, 13, 14

*Initiative & Referendum Inst. v. U.S. Postal Serv.*,
  417 F.3d 1299 (D.C. Cir. 2005) .................................................... 17

*Jennings v. Rodriguez*,
  138 S. Ct. 830 (2018) .................................................................. 19

*John Doe No. 1 v. Reed*,
  561 U.S. 186 (2010) .................................................................... 21

*Lujan v. Defenders of Wildlife*,
  504 U.S. 555 (1992) ...................................................................... 6

*March v. Mills*,
  867 F.3d 46 (1st Cir. 2017) ........................................................ 13

*McCullen v. Coakley*,
  573 U.S. 464 (2014) ............................................................. passim

*Melito v. Experian Mktg. Solutions, Inc.*,
  923 F.3d 85 (2d Cir. 2019) ........................................................... 6

*Minn. Voters All. v. Mansky*,
  138 S. Ct. 1876 (2018) ............................................................... 14

*NAACP Anne Arundel Cty. Branch v. City of Annapolis*,
  133 F. Supp. 2d 795 (D. Md. 2001) ............................................ 13

*Ognibene v. Parks*,
  671 F.3d 174 (2d Cir. 2011) ....................................................... 21

*Pac. Capital Bank, N.A. v. Conn.*,
  542 F.3d 341 (2d Cir. 2008) ......................................................... 7

*Perry Educ. Ass'n v. Perry Local Educators' Ass'n*,
  460 U.S. 37 (1983) ..................................................................... 10

*R.A.V. v. City of St. Paul*,
  505 U.S. 377 (1992) ................................................................... 10

*Reed v. Town of Gilbert*,
  135 S. Ct. 2218 (2015) ............................................................... 10

*Richmond Newspapers, Inc. v. Va.*,
  448 U.S. 555 (1980) ..................................................................... 8

*Sheppard v. Maxwell*,
  384 U.S. 333 (1966) ..................................................................... 9

*Susan B. Anthony List v. Driehaus*,
    573 U.S. 149 (2014) ............................................................... 7

*Turney v. Pugh*,
    400 F.3d 1197 (9th Cir. 2005) ............................................. 9

*Turney v. State*,
    936 P.2d 533 (Alaska 1997) ................................................ 18

*United States v. Carr*,
    424 F.3d 213 (2d Cir. 2005) ................................................ 1

*United States v. Grace*,
    461 U.S. 171 (1983) ................................................ 9, 10, 15

*United States v. Heicklen*,
    858 F. Supp. 2d 256 (S.D.N.Y. 2012) ........................... passim

*United States v. Playboy Entm't Grp.*,
    529 U.S. 803 (2000) ............................................................ 10

*United States v. Sayer*,
    748 F.3d 425 (1st Cir. 2014) ............................................... 13

*United States v. Stevens*,
    559 U.S. 460 (2010) ............................................................ 16

*United States v. Thomas*,
    116 F.3d 606 (2d Cir. 1997) ................................................ 1

*Va. v. Am. Booksellers Ass'n*,
    484 U.S. 383 (1988) ............................................................ 19

*Va. v. Hicks*,
    539 U.S. 113 (2003) ............................................................ 16

*Verlo v. City & Cty. of Denver*,
    124 F. Supp. 3d 1083 (D. Colo. 2015) ............................... 18

*Verlo v. Martinez*,
    820 F.3d 1113 (10th Cir. 2016) .......................................... 12

*Vt. Right to Life Comm. v. Sorrell*,
    221 F.3d 376 (2d Cir. 2000) ................................... 8, 19, 20

*Ward v. Rock Against Racism*,
  491 U.S. 781 (1989) ........................................................................... 12

*Wood v. Ga.*,
  370 U.S. 375 (1962) ............................................................................. 8

**Statutes**

18 U.S.C. § 1507 ................................................................................. 14

39 C.F.R. § 232.1 ................................................................................ 20

La. Stat. Ann. § 14:401 ...................................................................... 14

Mass. Gen. Laws ch. 268, § 13A ...................................................... 14

N.Y. Penal Law § 195.05 ................................................................... 13

N.Y. Penal Law § 215.10 ................................................................... 13

N.Y. Penal Law § 215.25 ................................................................... 13

N.Y. Penal Law § 215.50 ............................................................. 1, 3, 4

N.Y. Penal Law § 70.15 ....................................................................... 3

Plaintiff Michael Picard respectfully submits this pre-trial Memorandum of Law in support of his First Amendment claims for declaratory and injunctive relief against N.Y. Penal Law § 215.50(7).

## INTRODUCTION

Plaintiff Michael Picard challenges a provision of New York's criminal contempt statute that prohibits speech concerning the conduct of a trial within 200 feet of a courthouse. N.Y. Penal Law § 215.50(7) (the "Act"). Since 2016, Mr. Picard has been traveling to courthouses throughout the northeast United States to inform the public about jury nullification.[1] On December 4, 2017, Mr. Picard was arrested by a senior New York Court Officer for advocating jury nullification on the public sidewalk outside the Bronx Hall of Justice. The Bronx County District Attorney's Office declined to prosecute because the arresting officer had failed to measure whether Mr. Picard was within 200 feet of the courthouse. Mr. Picard was eventually released from custody ten hours after his arrest. As a result of his arrest and near brush with prosecution, Mr. Picard is too afraid to continue his jury nullification advocacy outside New York courthouses.

To vindicate his and others' First Amendment rights, Mr. Picard brought this pre-enforcement challenge against the Act, naming as Defendants Michael Magliano, the Chief of Public Safety for the New York Unified Court System, and Darcel D. Clark, the District Attorney for Bronx County, in their official capacities (collectively, the "State"). The Act is unconstitutional in at least three respects.

---

[1] "Jury nullification refers to a juror's inherent 'power' to ignore the law in her verdict. *United States v. Carr*, 424 F.3d 213, 219–20 (2d Cir. 2005) (citation omitted). While jury nullification 'is, by definition, a violation of a juror's oath to apply the law as instructed by the court,' it 'has a long history in the Anglo-American legal system.' *United States v. Thomas*, 116 F.3d 606, 614–15 (2d Cir. 1997)." Order, Doc. 32.

*First*, the Act is facially unconstitutional because it imposes a content-based restriction on speech on public streets and sidewalks, which are traditional public forums. The Act cannot satisfy strict scrutiny, or even intermediate scrutiny, because it is not narrowly tailored to the State's interest in protecting judicial proceedings against improper influence. The State has numerous options for advancing this interest without violating core First Amendment principles, such as enforcing laws that prohibit intentional jury and witness tampering.

*Second*, the Act is facially unconstitutional because it is substantially overbroad. In fact, because the Act imposes a facially impermissible restriction on speech in traditional public forums, the Act has no plainly legitimate sweep. But even if the State could identify some constitutional applications for the Act, they would be outweighed by the Act's overwhelming unconstitutionality as applied to protected speech on public streets and sidewalks.

*Third*, at the very least, the Act is unconstitutional as applied to Mr. Picard's jury nullification advocacy. There is no justification for criminalizing this form of political expression on public streets and sidewalks.

Finally, although Chief Magliano argues that the Act should be construed not to apply to Mr. Picard's jury nullification advocacy, his proposed narrowing interpretation is unavailing because it does nothing to resolve the Act's facial defects.

For these reasons, the Court should enter judgment in Plaintiff's favor and grant the declaratory and injunctive relief requested in the Complaint.

## FACTUAL AND PROCEDURAL BACKGROUND

### New York's Criminal Contempt Statute

New York's criminal contempt statute provides, in relevant part:

> A person is guilty of criminal contempt in the second degree when he engages in any of the following conduct:

. . .

> 7. On or along a public street or sidewalk within a radius of two hundred feet of any building established as a courthouse, he calls aloud, shouts, holds or displays placards or signs containing written or printed matter, concerning the conduct of a trial being held in such courthouse or the character of the court or jury engaged in such trial or calling for or demanding any specified action or determination by such court or jury in connection with such trial.
>
> Criminal contempt in the second degree is a class A misdemeanor.

N.Y. Penal Law § 215.50. A class A misdemeanor is punishable by up to 364 days in jail. *Id.* § 70.15.

### The Act's Application to Mr. Picard

Mr. Picard is a committed civil libertarian who strongly believes that jury nullification is an effective means to protest unjust laws. Affidavit of Michael Picard ¶ 3. Since 2016, Mr. Picard has advocated jury nullification by handing out flyers on public sidewalks outside courthouses throughout the northeast United States. *Id.* ¶ 3. He advocates for jury nullification outside courthouses because he believes that is the most relevant location to inform the public about jury nullification as a way to protest bad laws. *Id.* He does not research which trials are occurring before visiting a courthouse, and he has never attempted to influence a juror's vote in a particular case. *Id.* ¶ 4.

On December 4, 2017, Mr. Picard traveled to the Bronx County Hall of Justice to advocate jury nullification. Proposed Joint Pretrial Order, Statement of Stipulated Facts ¶ 1, Doc. 43; Picard Affidavit ¶ 6. Standing on the public sidewalk outside the courthouse entrance, he held up a sign reading "Jury Info" and passed out flyers. Statement of Stipulated Facts ¶¶ 2–5; Picard Affidavit ¶¶ 8, 9; Plaintiff's Exhibit 1. The flyers read "No Victim? No Crime. Google Jury Nullification" on one side and "'One has a moral responsibility to disobey unjust laws'— Martin Luther King Jr." on the other. Statement of Stipulated Facts ¶ 4; Picard Affidavit ¶ 9;

Plaintiff's Exhibit 2. Mr. Picard handed out flyers to about four pedestrians; he did not ask any of these individuals whether they were active jury members. Statement of Stipulated Facts ¶ 5; Picard Affidavit ¶ 10. Mr. Picard was not aware of any particular cases in which jurors were being impaneled or serving at the time, and he did not discuss any particular criminal proceedings with anyone. Picard Affidavit ¶ 11.

Shortly after Mr. Picard began handing out flyers, an officer approached him and informed him that it was against the law to distribute flyers about jury nullification within 200 feet of a courthouse. Statement of Stipulated Facts ¶ 6; Picard Affidavit ¶ 12. The officer warned Mr. Picard that he would be arrested if he did not move at least 200 feet from the courthouse. Statement of Stipulated Facts ¶ 6; Picard Affidavit ¶ 12. Mr. Picard refused to move, stating that he was standing on a public sidewalk and was permitted to distribute his informational flyers. Statement of Stipulated Facts ¶ 7; Picard Affidavit ¶ 13. New York State Court Officer Sergeant Vincent Allis then took Mr. Picard into custody for violating the Act; Mr. Picard was placed in a holding cell inside the Bronx Hall of Justice. Statement of Stipulated Facts ¶ 8; Picard Affidavit ¶ 14.

Several hours later, Assistant District Attorney Suzanna Talbot issued an Affidavit in Support of Declining/Deferring Prosecution. Statement of Stipulated Facts ¶ 9; Picard Affidavit ¶¶ 19–20; Plaintiff's Exhibit 3. The Affidavit identifies the charge against Mr. Picard as N.Y. Penal Law 215.50(7). Picard Affidavit ¶ 20; Plaintiff's Exhibit 3. The affidavit states in relevant part:

> The People decline to prosecute the instant matter due to insufficient evidence. On December 4, 2017, at 8:05am, arresting officer observed defendant on the sidewalk in front of the courthouse, holding and displaying a sign with the words printed JURY INFORMATION, and displaying pamphlets stating NO VICTIM NO CRIME. When the arresting officer approached Defendant and informed him that he needed to be 200 feet away from the courthouse to protest, the defendant refused to move. Since the officer did

4

not measure the distance between the defendant and the courthouse, the People have insufficient evidence to meet their burden of proof at trial and as such, the charges must be dismissed.

Statement of Stipulated Facts ¶ 9; Picard Affidavit ¶ 20; Plaintiff's Exhibit 3. Mr. Picard was then transferred to New York Police Department's Bronx Central Booking facility, where he was detained for another five hours. Picard Affidavit ¶ 15. He was eventually released from police custody at around 6:00 PM, roughly ten hours after his arrest. *Id.*

Since his arrest, Mr. Picard has not advocated jury nullification within 200 feet of a New York courthouse. *Id.* ¶ 22. He reasonably fears that, if he were to do so, he would be arrested and prosecuted for violating the Act. *Id.* ¶ 21. Were it not for the Act, Mr. Picard would continue his jury nullification advocacy outside New York courthouses, including in particular the Bronx Hall of Justice. *Id.* ¶ 22.

### The Lawsuit

On April 5, 2019, Mr. Picard filed his complaint against Defendants Michael Magliano, the Chief of Public Safety for the New York Unified Court System, and Darcel D. Clark, the District Attorney for Bronx County. Doc. 1. The Complaint alleges that the Act is facially unconstitutional because: (a) it is a content-based restriction on speech in a traditional public forum; (b) it unduly restricts political speech concerning the operation of the judicial system in a traditional public forum; and (c) it is substantially overbroad. *Id.* at 7–8. The Complaint further alleges that the Act is unconstitutional as applied to jury nullification advocacy. *Id.* at 8.

On December 2, 2019, the Court issued an Opinion and Order denying Defendants' motions to dismiss Mr. Picard's claims. Doc. 32. The Court held that Mr. Picard has standing to challenge the constitutionality of the Act. The Court explained that "it is reasonable for [Mr. Picard] to fear that he will be arrested if he again distributes his fliers within two hundred feet of

a New York courthouse," and "a declaration concerning the Act's constitutionality—whether on its face or as applied—would redress this alleged injury." *Id.* at 9. Finally, the Court held that District Attorney Clark may be named as a defendant in this lawsuit because her office is responsible for prosecuting violations of the Act in Bronx County, where Mr. Picard hopes to resume his jury nullification advocacy. *Id.* at 11–12.

Defendants filed their respective Answers to the Complaint on January 15, 2020. Docs. 36, 37. On January 24, the Court placed the case on the April 2020 trial-ready calendar. Doc. 40.

## ARGUMENT

### I.     Mr. Picard has standing to challenge the Act.

As this Court recognized in its Order denying Defendants' motions to dismiss, the facts alleged in the Complaint establish Mr. Picard's Article III standing to challenge the Act's constitutionality. Doc. 32. The Complaint's allegations are now borne out by the party's joint stipulations, Mr. Picard's affidavit, and the exhibits submitted by the parties. Mr. Picard has therefore conclusively established his standing to challenge the Act both on its face and as applied. Because it is Plaintiff's burden to establish his standing at all relevant stages of the litigation, *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992), the issues are briefly revisited in this memorandum.

To establish Article III standing, a plaintiff must have "(1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Melito v. Experian Mktg. Solutions, Inc.*, 923 F.3d 85, 92 (2d Cir. 2019) (citation omitted). Under the relaxed standing rules applied to First Amendment pre-enforcement challenges, a plaintiff may bring such an action if he establishes: his intention to engage in a course of conduct arguably affected with a constitutional interest; that his intended course of conduct is arguably proscribed by the challenged statute; and that

there exists a credible threat of prosecution under the challenged statute. *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 159, 162 (2014); *see also Farrell v. Burke*, 449 F.3d 470, 499 (2d Cir. 2006) (applying the same standard to facial overbreadth claims). "If a plaintiff's interpretation of a statute is reasonable enough and under that interpretation the plaintiff may legitimately fear that it will face enforcement of the statute, then the plaintiff has standing to challenge the statute." *Pac. Capital Bank, N.A. v. Conn.*, 542 F.3d 341, 350 (2d Cir. 2008) (citation and internal quotation marks omitted). The credible threat requirement is "a low threshold and is quite forgiving to plaintiffs seeking such preenforcement review." *Cayuga Nation v. Tanner*, 824 F.3d 321, 331 (2d Cir. 2016) (citation omitted).

Applying these principles, Mr. Picard has established his standing to challenge the Act. He has testified that he intends to engage in a course of conduct protected by the First Amendment and at least arguably proscribed by the Act—namely, advocating jury nullification within 200 feet of a New York courthouse. Picard Affidavit ¶¶ 3–5, 21–22. Mr. Picard's prior arrest and brush with prosecution for engaging in precisely this activity, Proposed Joint Pretrial Order, Statement of Stipulated Facts, Doc. 43; Picard Affidavit ¶¶ 6–21, demonstrate that it is reasonable for him to fear that he will be arrested again if he continues his jury nullification advocacy outside New York courthouses. Picard Affidavit ¶¶ 21, 22.

Although the district attorney ultimately declined to prosecute Mr. Picard under the Act, the district attorney's affidavit in support of declining prosecution demonstrates that the decision not to prosecute was based on the arresting officer's failure to measure Mr. Picard's distance from the courthouse, not on a legal conclusion that the Act categorically excludes Mr. Picard's expressive activities. Plaintiff's Exhibit 3. Mr. Picard has established that his expressive activities are "arguably proscribed" by the Act and that he faces a credible threat of prosecution

7

if he resumes his jury nullification advocacy outside New York courthouses. No more is required. *See Vt. Right to Life Comm. v. Sorrell*, 221 F.3d 376, 383 (2d Cir. 2000).

## II. The Act is facially unconstitutional because it imposes a content-based restriction on speech in a traditional public forum.

The Act criminalizes speech concerning the conduct of a trial on public streets and sidewalks within 200 feet of the courthouse in which the trial is being held. This is nothing less than a content-based restriction on political speech in a traditional public forum; the Act is therefore subject to strict scrutiny. It cannot survive strict scrutiny because the State has numerous other tools at its disposal to protect judicial proceedings from improper influence without infringing core First Amendment principles.

It is well established that speech concerning the operation of the judicial system is political speech at the heart of the First Amendment. Indeed, "it would be difficult to single out any aspect of government of higher concern and importance to the people than the manner in which criminal trials are conducted." *Richmond Newspapers, Inc. v. Va.*, 448 U.S. 555, 575 (1980). "[T]he criminal justice system exists in a larger context of a government ultimately of the people, who wish to be informed about happening in the criminal justice system, and, if sufficiently informed about those happenings, might wish to make changes in the system." *Gentile v. State Bar of Nev.*, 501 U.S. 1030, 1070 (1991) (plurality op.); *see also Craig v. Harney*, 331 U.S. 367, 374 (1947) ("A trial is a public event. What transpires in the court room is public property."). The First Amendment squarely protects speech concerning the operation of the criminal justice system, so long as that speech does not present a "clear and present danger to the administration of justice." *Wood v. Ga.*, 370 U.S. 375, 389 (1962); *see also United States v. Heicklen*, 858 F. Supp. 2d 256, 274 (S.D.N.Y. 2012).

At the same time, "the First Amendment does not create a right to influence juries outside of official proceedings, because '[d]ue process requires that the accused receive a trial by an impartial jury free from outside influences.'" *Heicklen*, 858 F. Supp. 2d at 274 (quoting *Sheppard v. Maxwell*, 384 U.S. 333, 362 (1966)) (alteration in original). "Consistent with this interpretation," courts have held "that the narrow category of speech knowingly made to jurors outside of an official proceeding and 'with the intent to influence the outcome of a specific case' [is] not protected by the First Amendment." *Id.* (quoting *Turney v. Pugh*, 400 F.3d 1197, 1201 (9th Cir. 2005)) (emphasis omitted). But the Act is not limited to speech knowingly made to jurors outside of an official proceeding, nor is it limited to speech made with the intent to influence the outcome of a specific case. Instead, it applies broadly to speech concerning a trial taking place within a nearby courthouse, including speech directed at journalists, fellow protestors, or members of the general public.

It is equally well established that the streets and sidewalks surrounding a courthouse are traditional public forums. "[P]ublic places historically associated with the free exercise of expressive activities, such as streets, sidewalks, and parks, are considered, without more, to be public forums." *United States v. Grace*, 461 U.S. 171, 177 (1983) (citations and internal quotation marks omitted). These traditional public forums do "not lose [their] historically recognized character" simply because they abut a courthouse. *Id.* at 180 (holding that the "public sidewalks forming the perimeter of the Supreme Court grounds . . . are public forums and should be treated as such for First Amendment purposes"); *see also Huminski v. Corsones*, 396 F.3d 53, 90–91 (2d Cir. 2005) (holding that a courthouse and courthouse grounds were nonpublic forums, but exempting abutting public streets and sidewalks).

In a traditional public forum, "[t]he government's ability to permissibly restrict expressive conduct is very limited: the government may enforce reasonable time, place, and manner regulations as long as the restrictions 'are content-neutral, are narrowly tailored to serve a significant government interest, and leave open ample alternative channels of communication.'" *Grace*, 461 U.S. at 177 (quoting *Perry Educ. Ass'n v. Perry Local Educators' Ass'n*, 460 U.S. 37, 45 (1983)). Content-based restrictions on speech in a traditional public forum are subject to strict scrutiny. *Hotel Emps. & Rest. Emps. Union v. City of N.Y. Dep't of Parks & Recreation*, 311 F.3d 534, 544–46 (2d Cir. 2002). Such regulations "are presumptively invalid." *R.A.V. v. City of St. Paul*, 505 U.S. 377, 382 (1992). To survive strict scrutiny, the State must demonstrate that the restriction is "the least restrictive means of achieving a compelling state interest." *McCullen v. Coakley*, 573 U.S. 464, 478 (2014). This "is the most demanding test known to constitutional law." *City of Boerne v. Flores*, 521 U.S. 507, 534 (1997). "[I]f a less restrictive means is available for the Government to achieve its goals, the Government must use it." *United States v. Playboy Entm't Grp.*, 529 U.S. 803, 815 (2000). It is the State's burden to demonstrate that any "plausible, less restrictive alternative would be ineffective" in achieving its goals. *Id.* at 824. Such a demonstration normally requires detailed evidence. At the very least, "the Government must present more than anecdote and supposition." *Id.* at 822.

The Act expressly imposes a content-based restriction on speech. "Government regulation of speech is content based if a law applies to particular speech because of the topic discussed or the idea or message expressed. This commonsense meaning of the phrase 'content based' requires a court to consider whether a regulation of speech 'on its face' draws distinctions based on the message a speaker conveys." *Reed v. Town of Gilbert*, 135 S. Ct. 2218, 2227 (2015) (citations omitted). In other words, a law is facially content based "if it require[s] 'enforcement

authorities' to 'examine the content of the message that is conveyed to determine whether' a violation has occurred." *McCullen*, 573 U.S. at 479 (holding that a Massachusetts law establishing 35-foot buffer zones around abortion clinics was content neutral, because the Act's enforcement did not depend on what people said within the buffer zone). In this case, the Act is facially content-based: It expressly criminalizes speech *about trials* taking place in a nearby courthouse.

The State cannot meet its burden under strict scrutiny. While the State has a compelling interest in protecting judicial proceedings from improper outside influence, the Act is not the least speech restrictive means to protect that interest. The State has plenty of tools at its disposal to protect this interest without criminalizing speech, on public streets and sidewalks, about the operation of the criminal justice system. In fact, New York already has several state laws that are explicitly targeted at unlawful attempts to influence judicial proceedings. For example, it is already a crime to intentionally tamper with a juror or witness in a pending trial. *See* N.Y. Penal Law § 215.25 ("A person is guilty of tampering with a juror in the first degree when, with intent to influence the outcome of an action or proceeding, he communicates with a juror in such action or proceeding, except as authorized by law."); *id.* § 215.10 ("A person is guilty of tampering with a witness when, knowing that a person is or is about to be called as a witness in an action or proceeding, (a) he wrongfully induces or attempts to induce such person to absent himself from, or otherwise to avoid or seek to avoid appearing or testifying at, such action or proceeding, or (b) he knowingly makes any false statement or practices any fraud or deceit with intent to affect the testimony of such person."). It is also already a crime to intentionally obstruct the administration of law "by means of intimidation, physical force or interference, or . . . any independently unlawful act." *Id.* § 195.05.

In addition to enforcing these existing criminal statutes, the State could impose content-neutral time, place, or manner restrictions on speech near courthouses. In a traditional public forum, a "regulation of the time, place, or manner of protected speech must be narrowly tailored to serve the government's legitimate, content-neutral interests but . . . need not be the least restrictive or least intrusive means of doing so." *Ward v. Rock Against Racism*, 491 U.S. 781, 798 (1989). This intermediate scrutiny is more lenient than the strict scrutiny applied to content-based restrictions on speech. "So long as the means chosen are not substantially broader than necessary to achieve the government's [important] interest," a time, place, or manner regulation "will not be invalid simply because a court concludes that the government's interest could be adequately served by some less-speech-restrictive alternative." *Id.* at 800. Thus, for example, the State could likely prohibit the use of sound trucks within a certain distance of the courthouse during operational hours. *See Verlo v. Martinez*, 820 F.3d 1113, 1137 n.9 (10th Cir. 2016).

To take another example, the State could prohibit picketing and parading near a courthouse with the intent to obstruct justice. Other states and the federal government have enacted such anti-picketing laws. *See* 18 U.S.C. § 1507 (prohibiting "picket[ing] or parad[ing]" near a courthouse "with the intent of interfering with, obstructing, or impeding the administration of justice, or with the intent of influencing any judge, juror, witness, or court officer"); La. Stat. Ann. § 14:401 (same); Mass. Gen. Laws ch. 268, § 13A (same). In *Cox v. Louisiana* (*Cox II*), 379 U.S. 559 (1965), the Supreme Court upheld Louisiana's anti-picketing law against a facial First Amendment challenge. The Court held that Louisiana's law was facially constitutional because it was "narrowly drawn" to the government's overriding interest in preventing the "influence or domination" of judicial proceedings "by either a hostile or friendly mob." *Id.* at 562.

The Act differs from the anti-picketing laws in at least two key respects. First, whereas the Act is facially content based, the anti-picketing laws are facially content neutral. *Cf. March v. Mills*, 867 F.3d 46, 59–60 (1st Cir. 2017) (holding that a specific intent requirement does not make a law content based). Thus, the anti-picketing laws are not subject to strict scrutiny. Second, the anti-picketing laws prohibit picketing and parading with the criminal "intent of interfering with, obstructing, or impeding the administration of justice." *Cox II*, 379 U.S. at 560. The Act here does not require the government to demonstrate that the defendant acted with specific criminal intent. This is a critical distinction. "[T]he lack of a specific intent requirement heightens the discrepancy" between speech that legitimately threatens the administration of justice and the Act's "intrusion on protected activities." *NAACP Anne Arundel Cty. Branch v. City of Annapolis*, 133 F. Supp. 2d 795, 812 (D. Md. 2001); *see also, e.g.*, *United States v. Sayer*, 748 F.3d 425, 435 (1st Cir. 2014) (upholding the federal interstate stalking statute against an overbreadth challenge on the ground that the statute "clearly targets conduct performed with serious criminal intent"). Unlike the anti-picketing laws, the Act makes it a crime for a solitary individual to stand across the street from a courthouse with a sign protesting a pending death penalty prosecution, even if the individual has no apparent intent or ability to obstruct justice. Such a sweeping restriction on speech is far more burdensome than necessary to prevent a "mob" from influencing a judicial proceeding.

The State could also impose content-based restrictions on speech in the courthouses themselves. Following several other courts, the Second Circuit has held "that the interior of a courthouse is not a public forum." *Huminski*, 396 F.3d at 91. The court reached the same conclusion regarding the "parking lots adjacent to the courthouse (and the courthouse grounds generally) . . . . [o]ther than abutting public streets and sidewalks." *Id.* In these nonpublic forums,

the State is free to prohibit speech concerning pending judicial proceedings, so long as the regulations are reasonable in light of the courthouse's function and viewpoint neutral. *Id.*; *see generally Minn. Voters All. v. Mansky*, 138 S. Ct. 1876 (2018).

Finally, courts have the authority to instruct jurors to disregard extrajudicial statements they may have heard about a pending case. "[O]ur judicial system rests, in part, on the belief that jurors every day follow much more difficult instructions, for instance, instructions to disregard eyewitness testimony that they just heard and ignore evidence that they just saw. It is just as reasonable to trust that jurors will follow a judge's instruction to accept the law as explained by the judge and disregard the contents of a pamphlet handed to them by a leafletter outside the courthouse." *Heicklen*, 858 F. Supp. 2d at 275 n.23. Courts also have recourse to other measures to prevent jurors from being improperly swayed by extrajudicial statements, such as instructing jurors to enter the courthouse through a private entrance or ordering court officials to escort jurors from their cars or taxis to the courthouse grounds.

The ready availability of these less-restrictive alternatives serves to distinguish this case from *Burson v. Freeman*, 504 U.S. 191 (1992). There, the Supreme Court held that a content-based law prohibiting the display of electioneering materials within 100 feet of a polling place survived strict scrutiny. *Id.* at 211. While "readily acknowledg[ing] that a law rarely survives such scrutiny," the Court observed that "an examination of the history of election regulation in this country reveals a persistent battle against two evils: voter intimidation and election fraud." *Id.* at 200, 206. To combat these evils, "all 50 States, together with numerous other Western democracies, settled on the same solution: a secret ballot secured in part by a restricted zone around the voting compartments." *Id.* at 206. The Court rejected respondents' argument that laws prohibiting intentional election interference or voter intimidation were a less restrictive

alternative to content-based buffer zones. *Id.* at 206–07. It explained that, "because law enforcement officers generally are barred from the vicinity of the polls to avoid any appearance of coercion in the election process, many acts of interference would go undetected." *Id.* at 207 (citation omitted). The Court concluded that "[t]hese undetected or less than blatant acts may nonetheless drive the voter away before remedial action can be taken." *Id.*

This case presents a starkly different situation. Courthouses have not historically been treated with the same sensitivity as polling locations. *See Grace*, 461 U.S. at 182–83 (rejecting the government's argument that banning flags, banners, and devices on the public sidewalks abutting the Supreme Court was necessary to maintain public order and prevent the appearance of outside influence). And while law enforcement officers may be barred from polling locations to avoid the appearance of coercion, there is no rule barring law enforcement officers from the vicinity of courthouses. *See McCullen*, 573 U.S. at 496. To the contrary, New York courts have their own court security officers on hand to escort jurors, witnesses, and court personnel into the courthouse, and to address potential juror or witness tampering outside the courthouse. Finally, whereas it was effectively impossible for the states to take remedial action in response to voter intimidation at a polling place, the courts themselves are able to take remedial action to address juror or witness tampering after it occurs—such as by instructing jurors to disregard information received about a case outside of official proceedings. Under these circumstances, the State cannot demonstrate that a content-based buffer zone outside of courthouses is the least restrictive means for advancing the State's interest in preventing improper influence on judicial proceedings.

Indeed, even if the Court were to analyze the Act under intermediate scrutiny, it would still fail judicial review because it is not narrowly drawn to the State's interest in protecting

judicial proceedings from improper influence. As the discussion above demonstrates, the State

"has available to it a variety of approaches that appear capable of serving its interests," without

suppressing political speech on public streets and sidewalks. *Id.* at 494. For example, the State

could impose appropriate restrictions on courthouse grounds, it could step up enforcement of

laws prohibiting jury tampering and witness tampering, or it could pass laws restricting picketing

and parading near a courthouse with the specific intent to obstruct justice. The State may object

that "a showing of intentional or deliberate" attempts to improperly influence the administration

of justice is "often difficult to prove." *Id.* at 495. Undoubtedly, the Act is easier to enforce

without a specific intent requirement. But to satisfy intermediate scrutiny, "the government must

demonstrate that alternative measures that burden substantially less speech would fail to achieve

the government's interests, not simply that the chosen route is easier." *Id.* Regardless, direct and

circumstantial evidence will often suffice to establish specific intent. *See Cox II*, 379 U.S. at

566–67. At the very least, the Act cannot satisfy intermediate scrutiny without a specific intent

requirement.

## III.     The Act is substantially overbroad.

The Act is also facially unconstitutional because it is substantially overbroad. A law that

infringes First Amendment freedoms "may be invalidated as overbroad if a substantial number of

its applications are unconstitutional, judged in relation to the statute's plainly legitimate sweep."

*United States v. Stevens*, 559 U.S. 460, 473 (2010) (citation and internal quotation marks

omitted). The Supreme Court "provided this expansive remedy out of concern that the threat of

enforcement of an overbroad law may deter or 'chill' constitutionally protected speech,"

including the First Amendment interests of third parties not before the Court, "especially when

the overbroad statute imposes criminal sanctions." *Va. v. Hicks*, 539 U.S. 113, 119 (2003).

In this case, the Act has no plainly legitimate sweep, because it expressly imposes an impermissible content-based restriction on speech in traditional public forums and because, even under intermediate scrutiny, the Act is not narrowly tailored to the State's interest in protecting judicial proceedings against improper influence. In other words, the Act imposes a facially invalid restriction on speech in traditional public forums. It is therefore unconstitutional in all its applications. *See, e.g.*, *Cutting v. City of Portland*, 802 F.3d 79, 86 (1st Cir. 2015) ("[A] content-neutral restriction on speech in a traditional public forum is facially unconstitutional if it does not survive the narrow tailoring inquiry, even though that ordinance might seem to have a number of legitimate applications." (citing *McCullen*, 573 U.S. 464)).

But even if the State could identify potential applications of the Act that would not violate the First Amendment, the vast majority of the Act's applications would still be unconstitutional. Under those circumstances, the Act would still be facially invalid under the substantial overbreadth doctrine. *See Initiative & Referendum Inst. v. U.S. Postal Serv.*, 417 F.3d 1299, 1313 (D.C. Cir. 2005) ("Given our conclusion that § 232.1(h)(1) [prohibiting solicitation of signatures on petitions, polls, or surveys on Postal Service property] is unconstitutional when applied to a public forum, one way in which the regulation would be overbroad is if a substantial number of exterior postal properties constitute public forums. If they do, the regulation creates an unacceptably high risk of chilling constitutionally protected [speech] on such properties."). Thus, for all the reasons described above, the Act is facially unconstitutional.

## IV. The Act violates the First Amendment as applied to Mr. Picard.

The Act is also unconstitutional as applied to Mr. Picard's jury nullification advocacy. To be sure, the First Amendment does not protect attempts to convince a juror to nullify in a particular case. *See Heicklen*, 858 F. Supp. 2d at 273–74 (discussing *Turney v. State*, 936 P.2d

17

533, 536–541 (Alaska 1997)). But outside this narrow context, jury nullification advocacy is generally entitled to the full protection of the First Amendment, even when it takes place outside a courthouse. *See, e.g.*, *Verlo v. City & Cty. of Denver*, 124 F. Supp. 3d 1083, 1091 (D. Colo. 2015) (granting a preliminary injunction allowing the Fully Informed Jury Association and other plaintiffs to hand out jury nullification pamphlets outside a state courthouse); *Heicklen*, 858 F. Supp. 2d at 271–74 (S.D.N.Y. 2012) (construing the federal jury tampering statute to exclude jury nullification advocacy outside a federal courthouse).

The Act unconstitutionally prohibits Mr. Picard from engaging in jury nullification advocacy on public streets outside of New York courthouses. For several years now, Mr. Picard has been traveling to courthouses throughout the Northeastern United States to advocate jury nullification. Picard Affidavit ¶ 3. He was arrested for violating the Act after he stood on a public sidewalk outside the Bronx Hall of Justice, holding up a sign that read "Jury Info" and passing out flyers instructing passersby to "Google Jury Nullification." *Id.* ¶¶ 8, 9. His peaceful advocacy poses no imminent threat to the administration of justice, and he has never sought to improperly influence a juror's vote in a particular case. Picard Affidavit ¶¶ 4, 11. There is no conceivable justification for prohibiting Mr. Picard from resuming his jury nullification advocacy on the public streets and sidewalks outside New York courthouses. The Act's application to Mr. Picard cannot satisfy strict or even intermediate First Amendment scrutiny.

## V.     The Act cannot be saved by a narrowing construction.

Chief Magliano argues that the Act should be construed to avoid any constitutional infirmities. Proposed Joint Pretrial Order at 4, Doc 43. "Under the constitutional-avoidance canon, when statutory language is susceptible of multiple interpretations, a court may shun an interpretation that raises serious constitutional doubts and instead may adopt an alternative that avoids those problems. But a court relying on that canon still must *interpret* the statute, not

rewrite it." *Jennings v. Rodriguez*, 138 S. Ct. 830, 836 (2018). The constitutional avoidance canon is unavailing here, however, because the text of the Act is not susceptible to any interpretations that would resolve its facial First Amendment defects.

Chief Magliano has asserted that the Act should be interpreted to prohibit speech concerning *specific* trials currently pending in a nearby courthouse. Magliano Mot. to Dismiss at 8. Because Mr. Picard's jury nullification advocacy "does not focus on any particular case currently on trial," Chief Magliano maintained that Mr. Picard's speech was "beyond the scope of the Act." *Id.* at 12. But Chief Magliano's preferred interpretation of the Act does not address the law's facial deficiencies. Even if the Act is interpreted to apply only to speech concerning a "particular case currently on trial" in a nearby courthouse, the Act would still be a content-based restriction on speech in traditional public forums, and it would still fail both strict and intermediate scrutiny because it is not narrowly drawn to the State's interest in protecting judicial proceedings against improper influence. The Court cannot avoid addressing these problems by interpreting the Act not to apply to Mr. Picard, especially since Chief Magliano's proposed interpretation does nothing to address the First Amendment rights of third parties whose interests are also before the Court on this facial First Amendment challenge. *See, e.g.*, *Va. v. Am. Booksellers Ass'n*, 484 U.S. 383, 392–93 (1988) (recognizing that plaintiffs raising facial First Amendment claims may assert the free expression interests of third parties not before the Court).

The Second Circuit's decision in *Vermont Right to Life Committee v. Sorrell* is directly on point. In that case, Vermont Right to Life Committee (VRLC) brought a facial First Amendment challenge against a state campaign finance law that established disclosure and reporting requirements for political advertising "on behalf of" a candidate, party, or political committee. 221 F.3d at 379–81. VRLC contended that it reasonably feared prosecution under the

law because it published advertisements benefiting certain candidates, parties, and political committees that shared VRLC's political beliefs. *Id.* at 383. The government argued that the court should interpret "on behalf of" narrowly to encompass only political advertisements made by "the agent or representative of" a candidate, party, or political committee. *Id.* The court held that even if "there may be other, perhaps even better, definitions" of the statutory language, VRLC's interpretation "is reasonable enough that it may legitimately fear that it will face enforcement of the statute by the State brandishing the definition proffered by VRLC." *Id.* Without further discussion on the meaning of the disputed statutory term "on behalf of," the court then proceeded to hold that the State's mandatory disclosure requirements facially violated the First Amendment. *Id.* at 387–89. Having concluded that VRLC had standing based on its "reasonable" interpretation of the Act, the court did not suggest that it could avoid its obligation to address the merits of VRLC's *facial* First Amendment challenge simply by interpreting the Act to exclude VRLC's speech.

The Court should take the same approach here. As discussed in Section I, Mr. Picard has standing to challenge the Act both on its face and as applied. The constitutional avoidance canon applies only on the merits to determine whether the Act can be interpreted to avoid any First Amendment problems. Because the Act is not susceptible to any interpretation that would save it from unconstitutionality, this Court should hold that the Act facially violates the First Amendment.

### VI.    A permanent injunction is warranted.

In addition to declaratory relief, a permanent injunction is appropriate to prevent the Act from further infringing First Amendment rights. "The party requesting permanent injunctive relief must demonstrate (1) irreparable harm (here, a constitutional violation) and (2) actual

success on the merits." *Ognibene v. Parks*, 671 F.3d 174, 182 (2d Cir. 2011). *See also Amoco Prod. Co. v. Vill. of Gambell*, 480 U.S. 531, 546 n.12 (1987) ("The standard for a preliminary injunction is essentially the same as for a permanent injunction with the exception that the plaintiff must show a likelihood of success on the merits rather than actual success.").

For the reasons set forth above, Mr. Picard succeeds on the merits of his First Amendment claim. Because "[t]he loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury," *Elrod v. Burns*, 427 U.S. 347, 373 (1976), Mr. Picard also satisfies the irreparable harm requirement. Defendants should therefore be enjoined from enforcing the Act, both on its face and as applied to Mr. Picard's jury nullification advocacy. *See, e.g.*, *Califano v. Yamaski*, 442 U.S. 682, 702 (1979) ("[T]he scope of injunctive relief is dictated by the extent of the violation established."); *accord John Doe No. 1 v. Reed*, 561 U.S. 186, 194 (2010).

## CONCLUSION

For the foregoing reasons, the Court should enter judgment in Plaintiff's favor and grant the declaratory and injunctive relief requested in the Complaint.


Dated: March 6, 2020

/s/ Brian Hauss
Brian Hauss
American Civil Liberties Union Foundation
125 Broad Street, 18th Floor
New York, New York 10004
(212) 549-2500
bhauss@aclu.org

*Counsel for Plaintiff*
