**UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| MICHAEL PICARD,<br><br>  Plaintiff,<br><br>– against –<br><br>DARCEL D. CLARK, in her official capacity as District Attorney for Bronx County, MICHAEL MAGLIANO, in his official capacity as Chief of Public Safety for the New York Unified Court System,<br><br>  Defendants. | No. 19 Civ. 3059 (DLC)<br><br>**PLAINTIFF'S PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW** |

Pursuant to this Court's Order dated January 24, 2020, Doc. 40, Plaintiff Michael Picard, by and through his undersigned attorney, respectfully submits the following proposed findings of fact and conclusions of law.

**FINDINGS OF FACT**

**The Act**

1.    New York Penal Law § 215.50(7) (the "Act") states in relevant part:

> A person is guilty of criminal contempt in the second degree when he engages in any of the following conduct:
> . . .
>  On or along a public street or sidewalk within a radius of two hundred feet of any building established as a courthouse, he calls aloud, shouts, holds or displays placards or signs containing written or printed matter, concerning the conduct of a trial being held in such courthouse or the character of the court or jury engaged in such trial or calling for or demanding any specified action or determination by such court or jury in connection with such trial.
>
>  Criminal contempt in the second degree is a class A misdemeanor.

1

**The Parties**

2.      Plaintiff Michael Picard is a resident of South Windsor, Connecticut. Affidavit of Michael Picard ¶ 2.

3.      Defendant Darcel D. Clark is the District Attorney for Bronx County, New York. Answer of Defendant Darcel D. Clark ¶ 6, Doc. 37. District Attorney Clark's office is located at 198 E. 161st Street, Bronx, New York 10451. *Id*. She is sued in her official capacity. Complaint ¶ 6.

4.      Defendant Michael Magliano is the Chief of Public Safety for the New York Unified Court System. Complaint ¶ 7; Answer of Defendant Michael Magliano ¶ 7, Doc. 36. He manages the court system's Department of Public Safety, which oversees the delivery of court security services to courts throughout New York State. Complaint ¶ 7*;* Magliano Answer ¶ 7. Chief Magliano's office is located at 25 Beaver Street, Room 810, New York, NY 10004. Complaint ¶ 7; Magliano Answer ¶ 7. He is sued in his official capacity. Complaint ¶ 7.

**The Events of December 4, 2017**

5.      Since 2016, Picard has advocated jury nullification by handing out flyers on public sidewalks outside courthouses throughout the northeast United States. *Id.* ¶ 3.

6.      Picard advocates for jury nullification because he believes that it is an effective means to protest unjust laws. Picard advocates outside courthouses because he believes it is the most relevant location to inform the public about jury nullification. *Id.*

7.      Picard does not research which trials are occurring before visiting a courthouse to advocate jury nullification. *Id.* ¶ 4. Rather, he picks locations based on convenience. *Id.*

8.      Picard has never attempted to influence a juror's vote in a particular case. *Id.*

9.     Picard performs his jury nullification advocacy by standing on public sidewalks outside courthouses and offering flyers to any interested individual who passes by. *Id.* ¶ 5. He has handed out flyers about jury nullification on approximately a dozen different occasions outside various courthouses. *Id.*

10.     On December 4, 2017, Picard traveled to the Bronx County Hall of Justice, located at 265 East 161 Street, Bronx, New York 10451, to advocate jury nullification. Joint Pretrial Order, Statement of Stipulated Facts ¶ 1, Doc. TK; Picard Affidavit ¶ 6.

11.     At about 8 a.m. on December 4, 2017, Picard stood on the public sidewalk on the north side of East 161 Street, between Sherman Avenue and Morris Avenue, outside the main entrance to the Bronx Hall of Justice. Statement of Stipulated Facts ¶ 2; Picard Affidavit ¶ 7.

12.     While standing at that location at about 8 a.m. on December 4, 2017, Picard held a single sign with the following wording: "Jury Info".  Statement of Stipulated Facts ¶ 3; Picard Affidavit ¶ 8; Plaintiff's Exhibit 1.

13.     At the same time and place, Picard had in his possession flyers with the following wording: "No Victim? No Crime. Google Jury Nullification" on one side and "'One has a moral responsibility to disobey unjust laws' –Martin Luther King Jr." on the other side. Statement of Stipulated Facts ¶ 4; Picard Affidavit ¶ 9; Plaintiff's Exhibit 2.

14.     Picard handed flyers to about four pedestrians. Picard did not ask any of these individuals whether they were active jury members. Statement of Stipulated Facts ¶ 5; Picard Affidavit ¶ 10.

15.     Picard was not aware of any particular cases in which jurors were being impaneled or serving at the time. He did not discuss any particular criminal proceedings with anyone outside the courthouse on December 4, 2017. Picard Affidavit ¶ 11.

16.     At approximately 8:05 a.m., a New York State Court Officer approached Picard and informed him that it is against the law to distribute flyers about jury nullification within 200 feet of a courthouse. The officer asked Picard several times to move and warned Picard that he would be arrested if he did not move at least 200 feet from the courthouse. Statement of Stipulated Facts ¶ 6; Picard Affidavit ¶ 12.

17.     Picard refused to move, stating that he was standing on a public sidewalk and was permitted to distribute his informational flyers advocating jury nullification. Statement of Stipulated Facts ¶ 7; Picard Affidavit ¶ 13.

18.     New York State Court Officer Sergeant Vincent Allis then took Picard into custody for allegedly violating the Act. Picard was placed in a holding cell inside the Bronx County Hall of Justice. Statement of Stipulated Facts ¶ 8; Picard Affidavit ¶ 14.

19.     Picard remained in the custody of New York State Court Officers until approximately 12:40 p.m. on December 4, 2017. He was then transferred to the custody of the New York City Police Department, and was released from police custody at approximately 6:00 p.m. on December 4, 2017. Picard Affidavit ¶ 15.

20.     The Affidavit in Support of Declining/Deferring Prosecution against Picard identifies the charge as N.Y. Penal Law 215.50(7). Picard Affidavit ¶ 20; Plaintiff's Exhibit 3. Under "Reason(s) for declining/deferring prosecution" it states:

> The people decline to prosecute the instant matter due to insufficient evidence. On December 4, 2017, at 8:05am, arresting officer observed defendant on the sidewalk in front of the courthouse, holding and displaying a sign with the words printed JURY INFORMATION, and displaying pamphlets stating NO VICTIM NO CRIME. When the arresting officer approached Defendant and informed him that he needed to be 200 feet away from the courthouse to protest, the defendant refused to move. Since the officer did not measure the distance between defendant and the courthouse, the People have insufficient evidence to meet their burden of proof at trial and as such, the charges must be dismissed."

Statement of Stipulated Facts ¶ 9; Picard Affidavit ¶ 20; Plaintiff's Exhibit 3.

21.     Picard fears that he will be arrested and prosecuted for violating the Act if he again advocates jury nullification within 200 feet of a courthouse in New York State. Picard Affidavit ¶ 21.

22.     Picard has not advocated jury nullification within 200 feet of a New York courthouse since his arrest on December 4, 2017. Were it not for the Act, Picard would continue his jury nullification advocacy outside New York courthouses, including in particular the Bronx Hall of Justice. Picard Affidavit ¶ 22.

## CONCLUSIONS OF LAW

### I.     Picard has standing to challenge the Act.

1.     To establish Article III standing, a plaintiff must have "(1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Melito v. Experian Mktg. Solutions, Inc.*, 923 F.3d 85, 92 (2d Cir. 2019) (citation omitted).

2.     Under the relaxed standing rules applied to First Amendment pre-enforcement challenges, a plaintiff may bring a pre-enforcement challenge if he establishes: an intention to engage in a course of conduct arguably affected with a constitutional interest; that the course of conduct is arguably proscribed by the challenged statute; that there exists a credible threat of prosecution under the challenged statute. *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 159, 162 (2014).

3.     Picard has established his standing to challenge the Act. He has testified that he intends to engage in a course of conduct protected by the First Amendment and at least arguably

proscribed by the Act—namely, advocating jury nullification within 200 feet of a New York courthouse.

4.     Picard's prior arrest and brush with prosecution for engaging in precisely this activity demonstrate that it is reasonable for him to fear that he will be arrested against if he continues his jury nullification advocacy outside New York courthouses.

## II.    The Act is facially unconstitutional because it imposes a content-based restriction on speech in a traditional public forum.

5.     Speech concerning the operation of the judicial system is political speech lying at the heart of the First Amendment. Indeed, "it would be difficult to single out any aspect of government of higher concern and importance to the people than the manner in which criminal trials are conducted." *Richmond Newspapers, Inc. v. Va.*, 448 U.S. 555, 575 (1980).

6.     "[T]he First Amendment squarely protects speech concerning judicial proceedings and public debate regarding the functioning of the judicial system, so long as that speech does not interfere with the fair and impartial administration of justice." *United States v. Heicklen*, 858 F. Supp. 2d 256, 274 (S.D.N.Y. 2012).

7.     Public streets and sidewalks surrounding a courthouse are traditional public forums. "Public places historically associated with the free exercise of expressive activities, such as streets, sidewalks, and parks, are considered, without more, to be public forums." *United States v. Grace*, 461 U.S. 171, 177 (1983) (citations and internal quotation marks omitted). These traditional public forums do "not lose [their] historically recognized character" simply because they abut a courthouse. *Id.* at 180

8.      In a traditional public forum, "[t]he government's ability to permissibly restrict expressive conduct is very limited: the government may enforce reasonable time, place, and manner regulations as long as the restrictions 'are content-neutral, are narrowly tailored to serve

a significant government interest, and leave open ample alternative channels of communication.'" *Id.* at 177 (quoting *Perry Educ. Ass'n v. Perry Local Educators' Ass'n*, 460 U.S. 37, 45 (1983)).

9.      "Government regulation of speech is content based if a law applies to particular speech because of the topic discussed or the idea or message expressed. This commonsense meaning of the phrase 'content based' requires a court to consider whether a regulation of speech 'on its face' draws distinctions based on the message a speaker conveys." *Reed v. Town of Gilbert*, 135 S. Ct. 2218, 2227 (2015) (citations omitted).

10.     Content-based restrictions on speech in a traditional public forum are subject to strict scrutiny. *Hotel Emps. & Rest. Emps. Union v. City of N.Y. Dep't of Parks & Recreation*, 311 F.3d 534, 544–46 (2d Cir. 2002). Such regulations "are presumptively invalid." *R.A.V. v. City St. Paul*, 505 U.S. 377, 382 (1992). To survive strict scrutiny, the State must demonstrate that the restriction is "the least restrictive means of achieving a compelling state interest." *McCullen v. Coakley*, 573 U.S. 464, 478 (2014). This "is the most demanding test known to constitutional law." *City of Boerne v. Flores*, 521 U.S. 507, 534 (1997). "[I]f a less restrictive means is available for the Government to achieve its goals, the Government must use it." *United States v. Playboy Entm't Grp.*, 529 U.S. 803, 815 (2000).

11.     The Act expressly imposes a content-based restriction on speech in traditional public forums: It criminalizes speech, on public streets and sidewalks, *about trials* taking place inside a nearby courthouse.

12.     As a content-based restriction on speech in a traditional public forum, the Act is subject to strict scrutiny, and the State bears the burden of demonstrating that it is the least restrictive means for advancing a compelling government interest. *Hotel Emps.*, 311 F.3d at 545.

13.     The State cannot meet its burden under strict scrutiny. Although the State has a compelling interest in protecting judicial proceedings from improper outside influence, the Act is not the least speech restrictive means protecting that interest.

14.     The State has plenty of tools at its disposal to protect this interest without criminalizing speech, on public streets and sidewalks, about the operation of the criminal justice system. New York law already makes it a crime to intentionally tamper with a juror or witness in a pending trial. N.Y. Penal Law § 215.25; *id.* § 215.10. New York also makes it a crime to intentionally obstruct the administration of law "by means of intimidation, physical force or interference, or . . . any independently unlawful act." *Id.* § 195.05.

15.     The State could also impose content-neutral time, place, or manner restrictions on speech near courthouses. In a traditional public forum, a "regulation of the time, place, or manner of protected speech must be narrowly tailored to serve the government's legitimate, content-neutral interests but . . . need not be the least restrictive or least intrusive means of doing so." *Ward v. Rock Against Racism*, 491 U.S. 781, 798 (1989). This intermediate scrutiny is more lenient than the strict scrutiny applied to content-based restrictions on speech. "So long as the means chosen are not substantially broader than necessary to achieve the government's [important] interest," a time, place, or manner regulation "will not be invalid simply because a court concludes that the government's interest could be adequately served by some less-speech-restrictive alternative." *Id.* at 800. For example, the State could likely prohibit the use of sound trucks within a certain distance of the courthouse during operational hours. *See Verlo v. Martinez*, 820 F.3d 1113, 1137 n.9 (10th Cir. 2016).

16.     To take another example, the State could prohibit picketing and parading near a courthouse with the intent to obstruct justice. Other States and the Federal Government have

enacted such anti-picketing laws. *See* 18 U.S.C. § 1507 (prohibiting "picket[ing] or parad[ing]" near a courthouse "with the intent of interfering with, obstructing, or impeding the administration of justice, or with the intent of influencing any judge, juror, witness, or court officer"); La. Stat. Ann. § 14:401 (same); Mass. Gen. Laws ch. 268, § 13A (same). In *Cox v. Louisiana* (*Cox II*), 379 U.S. 559 (1965), the Supreme Court upheld Louisiana's anti-picketing law against a facial First Amendment challenge. These anti-picketing laws satisfy intermediate scrutiny because they are "narrowly drawn" to the government's overriding interest in preventing the "influence or domination" of judicial proceedings "by either a hostile or friendly mob." *Id.* at 562.

17.     The Act differs from these anti-picketing laws in at least two key respects. First, whereas the Act is facially content based, the anti-picketing laws are facially content neutral. *Cf. March v. Mills*, 867 F.3d 46, 59–60 (1st Cir. 2017) (holding that a specific intent requirement does not make a law content based). Thus, the anti-picketing laws are not subject to strict scrutiny. Second, the anti-picketing laws prohibit picketing and parading with the criminal "intent of interfering with, obstructing, or impeding the administration of justice." *Cox II*, 379 U.S. at 560. The Act here does not require the government to demonstrate that the defendant acted with specific criminal intent. This is a critical distinction. "[T]he lack of a specific intent requirement heightens the discrepancy" between speech that legitimately threatens the administration of justice and the Act's "intrusion on protected activities." *NAACP Anne Arundel Cty. Branch v. City of Annapolis*, 133 F. Supp. 2d 795, 812 (D. Md. 2001); *see also, e.g.*, *United States v. Sayer*, 748 F.3d 425, 435 (1st Cir. 2014) (upholding the federal interstate stalking statute against an overbreadth challenge on the ground that the statute "clearly targets conduct performed with serious criminal intent"). Unlike the anti-picketing laws, the Act makes it a crime for a solitary individual to stand across the street from a courthouse with a sign protesting a

pending death penalty prosecution, even if the individual has no apparent intent or ability to obstruct justice. The Act's sweeping restriction on speech is far more burdensome than necessary to prevent a "mob" from influencing a judicial proceeding.

18.     In addition to establishing content-neutral restrictions on speech near its courthouses, the State could impose content-based restrictions on speech in the courthouses themselves. Following other courts, the Second Circuit has held "that the interior of a courthouse is not a public forum." *Huminski v. Corsones*, 396 F.3d 53, 91 (2d Cir. 2005). The court reached the same conclusion regarding the "parking lots adjacent to the courthouse (and the courthouse grounds generally) . . . . [o]ther than abutting public streets and sidewalks." *Id.* In the courthouse itself and on courthouse grounds, the State is free to prohibit speech concerning pending judicial proceedings, so long as the regulations are reasonable in light of the courthouse's function and viewpoint neutral. *Id.*

19.     Finally, courts have the authority to instruct jurors to disregard extrajudicial statements they may have heard about a pending case. "[O]ur judicial system rests, in part, on the belief that jurors every day follow much more difficult instructions, for instance, instructions to disregard eyewitness testimony that they just hear and ignore evidence that they just saw. It is just as reasonable to trust that jurors will follow a judge's instruction to accept the law as explained by the judge and disregard the contents of a pamphlet handed to them by a leafleteer outside the courthouse." *Heicklen*, 858 F. Supp. 2d at 275 n.23.

20.     Because it is not the least restrictive means for advancing the State's interest in protecting the administration of justice against improper influence, the Act fails strict scrutiny.

21.     The Act cannot even satisfy intermediate scrutiny, because it is not narrowly drawn to the State's interest in protecting judicial proceedings from improper influence. The

State "has available to it a variety of approaches that appear capable of serving its interests," without suppressing political speech on public streets and sidewalks. *McCullen*, 573 U.S. at 494. For example, the State could impose appropriate restrictions on courthouse grounds, it could step up enforcement of laws prohibiting jury tampering and witness tampering, or it could pass laws restricting picketing and parading near a courthouse with the specific intent to obstruct justice. Although the Act may be easier to enforce than laws requiring the government to demonstrate specific criminal intent, "the government must demonstrate that alternative measures that burden substantially less speech would fail to achieve the government's interests, not simply that the chosen route is easier." *Id*. at 495.

> **III.    The Act is substantially overbroad.**

22.    A law that infringes First Amendment freedoms "may be invalidated as overbroad if a substantial number of its applications are unconstitutional, judged in relation to the statute's plainly legitimate sweep." *United States v. Stevens*, 559 U.S. 460, 473 (2010) (citation and internal quotation marks omitted). The Supreme Court "provided this expansive remedy out of concern that the threat of enforcement of an overbroad law may deter or 'chill' constitutionally protected speech," including the speech of third parties not before the Court, "especially when the overbroad statute imposes criminal sanctions." *Va. v. Hicks*, 539 U.S. 113, 119 (2003).

23.    In this case, the Act has no plainly legitimate sweep because it expressly imposes an impermissible content-based restriction on speech in traditional public forums, and because, even under intermediate scrutiny, the Act is not narrowly tailored to the State's interest in protecting judicial proceedings against improper influence. In other words, the Act imposes a facially invalid restriction on speech in traditional public forums. It is therefore unconstitutional in all its applications.

24.     But even if there might exist some potential applications of the Act that would not violate the First Amendment, the vast majority of the Act's applications would still be unconstitutional. Under those circumstances, the Act would still be facially invalid under the substantial overbreadth doctrine. *See Initiative & Referendum Inst. v. U.S. Postal Serv.*, 417 F.3d 1299, 1313 (D.C. Cir. 2005).

### IV.     The Act violates the First Amendment as applied to Picard.

25.     Jury nullification advocacy is generally entitled to the full protection of the First Amendment, even when it takes place outside a courthouse. *See, e.g.*, *Verlo v. City & Cty. of Denver*, 124 F. Supp. 3d 1083, 1091 (D. Colo. 2015) (granting a preliminary injunction allowing the Fully Informed Jury Association and other plaintiffs to hand out jury nullification pamphlets outside a state courthouse); *Heicklen*, 858 F. Supp. 2d at 271–74 (construing the federal jury tampering statute to exclude jury nullification advocacy outside a federal courthouse).

26.     The Act unconstitutionally prohibits Picard from engaging in jury nullification advocacy on public streets outside of New York courthouses.

27.     The Act's application to Picard cannot satisfy strict or even intermediate First Amendment scrutiny.

### V.     The Act cannot be saved by a narrowing construction.

28.     "Under the constitutional avoidance canon, when statutory language is susceptible of multiple interpretations, a court may shun an interpretation that raises serious constitutional doubts and instead may adopt an alternative that avoids those problems. But a court relying on that canon still must *interpret* the statute, not rewrite it." *Jennings v. Rodriguez*, 138 S. Ct. 830, 836 (2018).

29.     The constitutional avoidance canon is unavailing here, however, because the text of the Act is not susceptible to any interpretations that would resolve the Act's facial First Amendment defects.

30.     Chief Magliano previously asserted that the Act should be interpreted to prohibit speech concerning *specific* trials currently pending in a nearby courthouse. Magliano Mot. to Dismiss at 8. Because Picard's jury nullification advocacy "does not focus on any particular case currently on trial," Chief Magliano maintained that Picard speech is "beyond the scope of the Act." *Id.* at 12. But Chief Magliano's preferred interpretation of the Act does not address the law's facial deficiencies. Even if the Act is interpreted to apply only to speech concerning a "particular case currently on trial" in a nearby courthouse, the Act would still be a content-based restriction on speech in traditional public forums, and it would still fail both strict and intermediate scrutiny because it is not narrowly drawn to the State's interest in protecting judicial proceedings against improper influence.

31.     The Court cannot avoid addressing these problems by interpreting the Act not to apply to Picard, especially because Chief Magliano's proposed interpretation does nothing to address the First Amendment rights of third parties whose interests are also before the Court on Plaintiff's facial challenge. *See, e.g.*, *Va. v. Am. Booksellers Ass'n*, 484 U.S. 383, 392–93 (1988) (recognizing that plaintiffs raising facial First Amendment claims may assert the free expression interests of third parties not before the Court).

32.     Because the Act is not susceptible to any interpretation that would save it from unconstitutionality, this Court should hold that the Act facially violates the First Amendment and grant appropriate declaratory and injunctive relief.

## VI. **Plaintiff satisfies the permanent injunction factors.**

33.    "The party requesting permanent injunctive relief must demonstrate (1) irreparable harm (here, a constitutional violation) and (2) actual success on the merits." *Ognibene v. Parks*, 671 F.3d 174, 182 (2d Cir. 2011). *See also Amoco Prod. Co. v. Vill. of Gambell*, 480 U.S. 531, 546 n.12 (1987) ("The standard for a preliminary injunction is essentially the same as for a permanent injunction with the exception that the plaintiff must show a likelihood of success on the merits rather than actual success.").

34.    For the reasons set forth above, Picard succeeds on the merits of his First Amendment claim. Because "[t]he loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury," *Elrod v. Burns*, 427 U.S. 347, 373 (1976). Picard also satisfies the irreparable harm requirement.

35.    Furthermore, because the Act facially violates the First and Fourteenth Amendments, a facial injunction is warranted. *Califano v. Yamaski*, 442 U.S. 682, 702 (1979) ("[T]he scope of injunctive relief is dictated by the extent of the violation established."); *accord John Doe No. 1 v. Reed*, 561 U.S. 186, 194 (2010).

36.    Alternatively, a permanent injunction prohibiting Defendants from enforcing the Act against Picard is warranted.


Tendered by:

/s/ Brian Hauss
Brian Hauss
American Civil Liberties Union Foundation
125 Broad Street, 18th Floor
New York, New York 10004
(212) 549-2500
bhauss@aclu.org

*Counsel for Plaintiff*