```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------X
                                          :
MICHAEL PICARD,                           :
                                          :
                         Plaintiff,       :     19cv3059 (DLC)
            -v-                           :
                                          :     OPINION AND ORDER
DARCEL D. CLARK, in her official          :
capacity as District Attorney for         :
Bronx County and MICHAEL MAGLIANO, in     :
his official capacity as Chief of         :
Public Safety for the New York Unified    :
Court System,                             :
                                          :
                         Defendants.      :
                                          :
-----------------------------------------X
```

APPEARANCES

For the plaintiff:
Brian Hauss
Arianna Marie Demas
American Civil Liberties Union Foundation
125 Broad Street, 18th Floor
New York, NY 10004

For defendant Darcel D. Clark:
James E. Johnson
Corporation Counsel for the City of New York
Susan P. Scharfstein
Of Counsel
100 Church Street
New York, NY 10007

For defendant Michael Magliano:
Letitia James
New York Attorney General
Michael A. Berg
Assistant Attorney General
28 Liberty Street
New York, NY 10005

DENISE COTE, District Judge:

At this bench trial, which has been submitted on the written record, Michael Picard ("Picard") challenges the constitutionality of New York Penal Law § 215.50(7) ("§ 50(7)" or the "Act").  This misdemeanor criminal contempt statute prohibits shouting and display of signage within two hundred feet of a courthouse where that speech concerns a trial ongoing in that courthouse.  As explained below, the Act is facially unconstitutional.

## Background

The following constitutes the Court's findings of fact. On December 4, 2017, Picard stood on the public sidewalk outside the Bronx County Hall of Justice, located at 265 East 161 Street, Bronx, New York, to advocate for jury nullification.[1]  He stood on the north side of East 161 Street, between Sherman Avenue and Morris Avenue, outside the main entrance to the courthouse.  While there, he held a single sign with the words "Jury Info."

---

[1] Jury nullification refers to a juror's inherent "power" to ignore the law in her verdict. United States v. Carr, 424 F.3d 213, 219-20 (2d Cir. 2005) (citation omitted).  While jury nullification "is, by definition, a violation of a juror's oath to apply the law as instructed by the court," it "has a long history in the Anglo-American legal system." United States v. Thomas, 116 F.3d 606, 614-15 (2d Cir. 1997).

Picard also handed about four pedestrians flyers that said: "No Victim?  No Crime.  Google Jury Nullification" on one side and "'One has a moral responsibility to disobey unjust laws' – Martin Luther King Jr." on the other side.  Picard did not ask any of these individuals whether they were serving on a jury.

About five minutes after Picard began to distribute his flyers, a New York State Court Officer approached Picard and informed him that it is against the law to distribute flyers about jury nullification within two hundred feet of a courthouse.  Several times, the officer asked Picard to move and warned him that he would be arrested if he did not move at least 200 feet from the courthouse.

Picard refused to move.  He stated that he was standing on a public sidewalk and was permitted to distribute flyers advocating jury nullification.  A New York State Court Officer took Picard into custody for violating the Act.

Picard was released several hours later when a New York County Assistant District Attorney ("ADA") declined to pursue the charge.  The ADA's Affidavit explaining that decision stated in relevant part:

> The People decline to prosecute the instant matter due to insufficient evidence.  On December 4, 2017, at 8:05am, arresting officer observed defendant on the sidewalk in front of the courthouse, holding and displaying a sign with the words printed JURY INFORMATION, and displaying pamphlets stating NO VICTIM NO CRIME.  When the arresting officer

3

approached Defendant and informed him that he needed to be 200 feet away from the courthouse to protest, the defendant refused to move. Since the officer did not measure the distance between defendant and the courthouse, the People have insufficient evidence to meet their burden of proof at trial and as such, the charges must be dismissed.

Although Picard was arrested for an alleged violation of § 50(7), it is useful to the discussion that follows to recite the entirety of N.Y. Penal Law § 215.50. It provides:

> A person is guilty of criminal contempt in the second degree when he engages in any of the following conduct:
>
> 1. Disorderly, contemptuous, or insolent behavior, committed during the sitting of a court, in its immediate view and presence and directly tending to interrupt its proceedings or to impair the respect due to its authority; or
>
> 2. Breach of the peace, noise, or other disturbance, directly tending to interrupt a court's proceedings; or
>
> 3. Intentional disobedience or resistance to the lawful process or other mandate of a court except in cases involving or growing out of labor disputes as defined by subdivision two of section seven hundred fifty-three-a of the judiciary law; or
>
> 4. Contumacious and unlawful refusal to be sworn as a witness in any court proceeding or, after being sworn, to answer any legal and proper interrogatory; or
>
> 5. Knowingly publishing a false or grossly inaccurate report of a court's proceeding; or
>
> 6. Intentional failure to obey any mandate, process or notice, issued pursuant to articles sixteen, seventeen, eighteen, or eighteen-a of the judiciary law, or to rules adopted pursuant to any such statute or to any special statute establishing

>     commissioners of jurors and prescribing their duties
>     or who refuses to be sworn as provided therein; or
>
> 7.  On or along a public street or sidewalk <u>within a
>     radius of two hundred feet of any building
>     established as a courthouse</u>, he calls aloud, shouts,
>     holds or displays placards or signs containing
>     written or printed matter, <u>concerning the conduct of
>     a trial being held in such courthouse</u> or the
>     character of the court or jury engaged in such trial
>     or calling for or demanding any specified action or
>     determination by such court or jury in connection
>     with such trial.
>
> Criminal contempt in the second degree is a class A
> misdemeanor.

N.Y. Penal Law § 215.50 (emphasis supplied).  Under New York law, a class A misdemeanor carries a maximum sentence of one year of imprisonment.  <u>Id.</u> § 70.15(1).

Since his arrest, Picard has not advocated for jury nullification within 200 feet of a courthouse in New York State. He fears that, if he were to do so, he would be arrested and prosecuted for violating the Act.  Were it not for the Act, he would continue his advocacy outside of courthouses in New York, including the Bronx County Hall of Justice.

Picard filed this action on April 5, 2019.  Picard has sued Michael Magliano, Chief of Public Safety for the New York Unified Court System, and Darcel D. Clark, District Attorney for Bronx County, in their official capacities.  Picard seeks declaratory and injunctive relief under the First and Fourteenth Amendments.  Picard asserts that the Act is facially

unconstitutional because it imposes a content-based restriction on speech in a traditional public forum.  He argues that the Act is substantially overbroad because the vast majority of its applications will be unconstitutional.  Picard adds that, in any event, the Act violates the First Amendment as applied to Picard.

On December 2, 2019, the Court rejected the defendants' assertion that Picard lacked standing to bring this lawsuit.[2]  Picard v. Clark, No. 19CV3059 (DLC), 2019 WL 6498306, at *1 (S.D.N.Y. Dec. 2, 2019) (the "December 2019 Opinion").  On March 6, 2020, the parties filed a joint pretrial order in which they consented to submit this case to the Court for a verdict based on the written record.

## Discussion

The First Amendment, which applies to the states through the Fourteenth Amendment, "provides that 'Congress shall make no law abridging the freedom of speech.'"  Hobbs v. Cty. of Westchester, 397 F.3d 133, 148 (2d Cir. 2005) (citing U.S. Const. amend. I).  "Speech on matters of public concern is at

---

[2] The defendants continue to argue that the plaintiff lacks standing to bring this First Amendment challenge to the Act. For the reasons explained in the December 2019 Opinion, that argument is rejected.  It is true, however, that Picard's conduct did not violate the Act as construed here.  As the defendants point out, Picard may have recourse for his detention through other avenues, including an action brought under 42 U.S.C. § 1983.

the heart of the First Amendment[]" and is "entitled to special protection." Snyder v. Phelps, 562 U.S. 443, 451-52 (2011) (citation omitted).

Ordinarily, to succeed in a facial attack to the constitutionality of a statute, a plaintiff must establish that "no set of circumstances exists under which [the law] would be valid, or that the statute lacks any plainly legitimate sweep." United States v. Stevens, 559 U.S. 460, 472 (2010) (citation omitted). "In the First Amendment context, however, th[e] Court recognizes a second type of facial challenge, whereby a law may be invalidated as overbroad if a substantial number of its applications are unconstitutional, judged in relation to the statute's plainly legitimate sweep." Id. at 473 (citation omitted). In an as-applied challenge, by contrast, a court must assess whether a statute, even if constitutional on its face, "deprived the individual to whom it was applied of a protected right." Field Day, LLC v. Cty. of Suffolk, 463 F.3d 167, 174 (2d Cir. 2006).

Picard brings a facial challenge to § 50(7) as a content-based restriction of speech in a traditional public forum. In traditional public fora, "any restriction based on the content of the speech must satisfy strict scrutiny, that is, the restriction must be narrowly tailored to serve a compelling government interest." Pleasant Grove City, Utah v. Summum, 555

U.S. 460, 469 (2009).  See also Johnson v. Perry, 859 F.3d 156, 172 (2d Cir. 2017).  There is no dispute that protection of the integrity of the judicial process represents a compelling government interest.  For example, the Supreme Court has "recognized the vital state interest in safeguarding public confidence in the fairness and integrity of the nation's elected judges."  Williams-Yulee v. Fla. Bar, 575 U.S. 433, 445 (2015) (citation omitted).

"Government regulation of speech is content based if a law applies to particular speech because of the topic discussed or the idea or message expressed."  Reed v. Town of Gilbert, Ariz., 576 U.S. 155, 163 (2015) (citation omitted).  That is, a law is "content based if it require[s] enforcement authorities to examine the content of the message that is conveyed to determine whether a violation has occurred."  McCullen v. Coakley, 573 U.S. 464, 479 (2014) (citation omitted).

Even if serving a compelling state interest, a content-based restriction on speech must be "the least restrictive means among available, effective alternatives."  Ashcroft v. ACLU, 542 U.S. 656, 666 (2004).  "When a plausible, less restrictive alternative is offered to a content-based speech restriction, it is the Government's obligation to prove that the alternative will be ineffective to achieve its goals."  United States v. Playboy Entm't Grp., Inc., 529 U.S. 803, 816 (2000).  A narrowly

8

tailored restriction must be neither under- nor overinclusive. Reed, 576 U.S. at 172; Republican Party of Minnesota v. White, 536 U.S. 765, 775 (2002).

Content-neutral regulations, by contrast, may "limit the time, place, or manner of expression -- whether oral, written, or symbolized by conduct -- even in a public forum," so long as the regulations are "reasonable," "narrowly tailored to serve a significant governmental interest, and leave open ample alternative channels for communication of the information." Hobbs, 397 F.3d at 149 (citation omitted). "The narrow tailoring requirement is satisfied so long as the regulation promotes a substantial governmental interest that would be achieved less effectively absent the regulation." Id. (citation omitted). Thus, a content-neutral restriction "need not be the least restrictive or least intrusive means of" serving the governmental interest. Id. (citation omitted).

Traditional public fora are those places which "by long tradition or by government fiat have been devoted to assembly and debate." Huminski v. Corsones, 396 F.3d 53, 89 (2d Cir. 2005) (citation omitted). They include areas such as "streets and parks which have immemorially been held in trust for the use of the public and, time out of mind, have been used for purposes of assembly." Johnson, 859 F.3d at 172 (citation omitted). Public sidewalks, including the sidewalks surrounding the

9

Supreme Court, are public fora. United States v. Grace, 461 U.S. 171, 177, 183 (1983).

The Act is subject to strict scrutiny. While § 50(7) is viewpoint neutral, it is not content neutral. See Boos v. Barry, 485 U.S. 312, 319 (1988). Section 50(7) is triggered when the speaker engages in speech that concerns the conduct of a trial that is ongoing in an adjacent courthouse. Any enforcement of the Act must consider the content of the speech to determine whether it is directed towards an ongoing trial. Furthermore, § 50(7) restricts speech in a traditional public forum -- public sidewalks.

It is undisputed by the parties that the Act is directed towards a compelling state interest. It seeks to protect the integrity of the judicial process by shielding trial participants, including jurors and witnesses, from undue influence during their engagement in trials. This promotes the rule of law and the legitimate functioning of the justice system. This understanding of the role and purpose of § 50(7) is confirmed by an examination of its surrounding provisions. For example, § 50(1) prohibits "[d]isorderly, contemptuous, or insolent behavior" occurring in the presence of a court. N.Y. Penal Law § 215.50(1). Section 50(2) prohibits a "breach of the peace" that interrupts court proceedings. Id. § 215.50(2). Section 50(4) prohibits a witness's "unlawful refusal to be

sworn" as a witness in court. Id. § 215.50(4). Each of these provisions is directed towards the integrity of an ongoing court proceeding.

That understanding of the Act's purpose is confirmed as well by an examination of its legislative history. The Act was intended to restrict the expression of opposition to ongoing court proceedings, whether those expressions were peaceful or not. It was prompted by the picketing around a federal courthouse in New York State to protest the prosecution of leaders of the Communist Party in 1949. As explained by the proponent of the Act,

> a picketing line was maintained by Communists and others, on the sidewalk immediately in front of the Federal Courthouse at Foley Square, Manhattan, during the entire trial of the eleven ring leaders of the Communist Party. The pickets carried signs demanding the dismissal of the indictment, the freeing of the defendants and other remedies, addressing Judge [Harold] Medina by name.[3]

---

[3] On October 21, 1949, Eugene Dennis and ten other leaders of the Communist Party were convicted following a nine-month trial. A jury found Dennis and his co-defendants guilty of violating 18 U.S.C. § 2385, which proscribes activity and advocacy aimed at "overthrowing or destroying the government of the United States or the government of any State, Territory, District or Possession thereof." 18 U.S.C. § 2385. Of particular importance in the trial of Dennis and his co-defendants was § 2385's prohibition on conspiring to "organize any society . . . who teach, advocate, or encourage the overthrow or destruction of any such government by force or violence." Id.; United States v. Dennis, 183 F.2d 201, 205 (2d Cir. 1950), aff'd, 341 U.S. 494 (1951).

11

Letter from Thomas Duffy, Member of New York State Assembly, to Thomas Dewey, Governor, Bill Jacket, L. 1952, ch. 669, at 10 ("Duffy Letter").[4]

What is now § 50(7) was ratified in 1952 as Assembly Bill 657 (the "Bill") and signed into law that same year.[5] In his endorsement of the Bill, the New York Attorney General explained:

> The proposed amendment is aimed at persons or groups who, inspired by peculiar ideologies or principles contrary the democratic process, readily resort to disorderly and embarrassing action by way of demonstrating their discontent.
>
> In order to deal effectively with this sort of irresponsible conduct, to say nothing of maintaining the dignity of the courts, I recommend approval of the bill.

Memorandum from Nathaniel L. Goldstein, Attorney General, to Thomas Dewey, Governor, Bill Jacket, L. 1952, ch. 669, at 8.

While the Attorney General referred to disorderly demonstrations, the Bill's principal proponent emphasized that it would reach "peaceful picketing" directed at an ongoing trial as well. He explained that, "[u]nder existing law, it appears

---

[4] The New York Court of Appeals commonly relies on submissions included in the Bill Jacket as a source of legislative history. See, e.g., Kimmel v. State, 29 N.Y.3d 386, 398-400 (2017).

[5] A predecessor bill had been rejected by the Governor. Duffy Letter at 10. The language that now comprises § 50(7) assumed its current location in the New York Penal Law in 1965. 1965 N.Y. Laws 2438-39.

that if the pickets are quiet and orderly, regardless of the legend appearing on the placards, there is no remedy." Duffy Letter at 10. In his view, the Bill was necessary to combat the "inherent evil" of "the attempt to influence the Court and jury[] in the determination of the issue involved," whether "the attempt is made quietly or noisily." Id. The Bill was "aimed at the obvious attempt of those picketing[] to influence the Court or Jury, in the determination of the litigation taking place in the Court."[6] Id.

In defense of the Act, the defendants principally argue that the Act is narrowly drawn to restrict speech in the immediate vicinity of a state courthouse that is likely to disrupt or unduly influence a pending trial. As such, they argue, it complements the state laws prohibiting witness and jury tampering and the obstruction of governmental administration.

To a degree, the defendants are right. The Act applies only to speech within the immediate vicinity of the courthouse

---

[6] A 2007 Advisory Committee report confirmed that the purpose of the Act was to "prevent judges, jurors, and other court officials from being influenced by the demonstrations at or near the courtroom at or prior to the proceeding." See Advisory Comm. on Local Courts, Report of the Advisory Committee on Local Courts to the Chief Administrative Judge of the Courts of the State of New York, 6-7 (2007). The Committee's recommendation that the Act be broadened to include demonstrations regarding any court proceeding, and not just trials, never became law.

13

and only that speech that concerns trials being held in that very courthouse at that very moment. It helps preserve the integrity of those proceedings by allowing the trial participants to enter and leave the courthouse, whether they be witnesses or jurors, without being subjected at the courthouse entrances to shouting or signage concerning the trial. It promotes the duty of witnesses to tell the truth and of jurors to follow a judge's instructions on the law and return a verdict based on the evidence received in the courtroom, all without regard to public opinion or influence. Section 50(7) is also viewpoint neutral. It does not single out the expression of any particular opinion. Nor does it regulate private expression of opinion. It does not regulate, for instance, either speech for or against the state or any particular party, or speech favorable to or critical of the conduct of the judicial proceedings that may occur within 200 feet of the courthouse, so long as the speaker's views concerning the trial are not shouted or displayed. Thus, the speaker may speak her mind to assembled journalists or others gathered near the courthouse without running afoul of the statute.

Picard is wrong therefore when he argues that the Act is not narrowly tailored because it applies to speech directed at journalists and fellow protestors. The Act forbids calling

aloud, shouting and displaying placards. It does not forbid speaking to journalists or anyone else.

The defendants, however, are mistaken insofar as they argue that the Act only criminalizes expression that is likely to disrupt ongoing proceedings. The statute contains no such limitation. Unlike other provisions of § 215.50, § 50(7) does not state that the prohibited expression must directly tend to interrupt court proceedings. See N.Y. Penal Law §§ 50(1), 50(2).

As noted, because the Act is a content-based restriction on speech that concerns matters of public interest in a public forum, it is subject to the "most exacting scrutiny." Boos, 485 U.S. at 321. The defendants have not shown that the state must criminalize speech in this way to protect the integrity of ongoing trials.[7] To the extent that speakers are obstructing passage on the sidewalks or engaging with others in demonstrations, there are content-neutral regulations to maintain public order and access to a public building. And, of course, there are laws that make it a crime to tamper intentionally with jurors and witnesses. And, while it may pose a not inconsiderable burden on the court system, if jurors or witnesses must be escorted to and from the courthouse to

---

[7] None of the parties have pointed to or discussed the legislative history of the Act.

15

encourage or protect their service on a particular trial, that can be done as well.

Unlike Burson v. Freeman, 504 U.S. 191, 206 (1992), where the Court could point to a "widespread and time-tested consensus" that demonstrated that restricted zones were necessary to serve the states' compelling interests in preventing voter intimidation and election fraud, the defendants have not offered any such evidence of necessity to protect the trial process.  To the contrary, as the defendants point out, only four individuals have been arrested for alleged violations of the Act in the last fourteen years.  While that lack of violation may be a tribute to the Act's success in deterring violations, it is just as likely to suggest that there has been very little need for the Act.  Whichever may be true, under the demanding standard against which § 50(7) must be measured, it is the defendants' burden to prove the Act is necessary to protect the fair administration of justice.  The Court cannot draw that conclusion on the record before it.

The defendants argue that the Court should narrowly construe the Act to avoid a constitutional question but have offered no construction of the Act to achieve that goal.  It is true that a federal court may narrowly construe a state law to avoid constitutional infirmity when the statute is "readily susceptible to the limitation."  Vermont Right to Life Comm.,

Inc. v. Sorrell, 221 F.3d 376, 386 (2d Cir. 2000) (citation omitted). A federal court may not, however, "rewrite a state law to conform it to constitutional requirements." Id. (citation omitted). A litigant's failure to offer a limiting construction that would avoid a constitutional question may suggest that such a construction is not readily available. See Erznoznik v. City of Jacksonville, 422 U.S. 205, 216 n.15 (1975). The Court perceives no readily available alternative construction of the Act that would accomplish the perceived goal of the legislation and avoid a constitutional question.

Picard seeks a permanent injunction against enforcement of § 50(7). A plaintiff seeking to enjoin the enforcement of a statute or regulation must demonstrate an entitlement to such equitable relief by showing (1) irreparable injury and (2) actual success on the merits. See Amoco Prod. Co. v. Village of Gambell, 480 U.S. 531, 542, 546 n.12 (1987); Ognibene v. Parkes, 671 F.3d 174, 182 (2d Cir. 2011). Because it is an equitable remedy, a permanent injunction also requires a showing that remedies at law are inadequate, that it is warranted in light of the balance of hardships between the parties, and that the injunction would not disserve the public interest. Id. See also Winter v. Nat. Res. Def. Council, Inc., 555 U.S. 7, 20, 32 (2008). "The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury."

New York Progress and Protection PAC v. Walsh, 733 F.3d 483, 486 (2d Cir. 2013) (citation omitted).  See also Ognibene, 671 F.3d at 182.

Picard has demonstrated that he is entitled to a permanent injunction against enforcement of § 50(7).  He has succeeded on the merits and the risk of constitutional injury satisfies the irreparable harm requirement.  A legal remedy would be inadequate to remedy that injury.  Furthermore, the balance of hardships tilts decidedly in favor of enjoining enforcement of the Act.  Indeed, the defendants represent that prosecutions under the Act are rare.  Lastly, continued enforcement, however uncommon, of a constitutionally impermissible law would not serve the public interest.

## Conclusion

New York Penal Law § 215.50(7) violates the First Amendment of the U.S. Constitution because it is a content-based restriction on speech in a public forum that fails strict scrutiny.  The parties are directed to submit a proposed final judgment by **August 14, 2020.**

Dated:    New York, New York
          July 29, 2020

```
                              _____
                                    DENISE COTE
                              United States District Judge
```